IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

KELLY REALS                                                          PLAINTIFF

v.                              Civil No. 08-3063

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                       DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Kelly Reals, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## Procedural Background

The plaintiff filed her applications for DIB and SSI on January 27, 2006, alleging an onset date of March 4, 2004, due to bipolar disorder, post traumatic stress disorder, and borderline personality disorder. (Tr. 46-47). Her applications were initially denied and that denial was upheld upon reconsideration. (Tr. 26-27, 367-368). Plaintiff then made a request for a hearing by an Administrative Law Judge ("ALJ"). An administrative hearing was held on September 13, 2007. (Tr. 375-399). Plaintiff was present and represented by counsel.

At this time, plaintiff was 40 years of age and possessed a high school education. (Tr. 24, 229, 377, 382). She has past relevant work experience as a nursery/daycare worker, fiberglass roller, cashier, and food service worker. (Tr. 53-60, 61-68).

On June 27, 2008, the ALJ found that plaintiff's bipolar II disorder, post-traumatic stress disorder ("PTSD"), and borderline personality disorder were severe, but did not meet or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 15-18). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform work at all exertional levels. However, he concluded that plaintiff was moderate limited in the ability to understand, remember, and carry out complex instructions; make judgment on complex work-related decisions; interact appropriately with co-workers, supervisors, and the public; and respond appropriately to usual work situations and routine work changes. (Tr. 20). With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a hand packager, poultry eviscerator, cleaner/housekeeping, and small products assembler. (Tr. 24).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on August 28, 2008. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 7, 8).

## Applicable Law

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind

AO72A
(Rev. 8/82)

would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

## Discussion

Plaintiff contends that the ALJ erred by failing to properly consider her subjective complaints. When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing her reasons for discrediting the

AO72A
(Rev. 8/82)

testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

In the present case, plaintiff was consistently diagnosed with and treated for bipolar II disorder, PTSD, and personality disorder. We note that the ALJ dismissed plaintiff's subjective complaints, due in large part to the fact that there were times when plaintiff had failed to take her medication as prescribed. While we do agree that the record reveals periods during which plaintiff did not take her medication, it is not uncommon for patients suffering from bipolar disorder and/or schizophrenia to discontinue their medications at will. *See* DSM IV-TR 304, 321, 359; Charolette E. Grayson, *Bipolar Disorder: Taking Your Bipolar Medication*, *at*

4

www.webmd.com; Agnes Hatfield, *Medication Non-Compliance*, *at* www.schizophrenia.com. According to the DSM, patients suffering from schizophrenia, schizoaffective disorder, and bipolar disorder also suffer from anosognosia, or poor insight. DSM IV-TR 304, 321, 359. "Evidence suggests that poor insight is a manifestation of the illness, rather than a coping strategy. . . . This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness." *Id.* As such, we believe that the ALJ should have taken this into consideration prior to rendering his opinion. Because the ALJ failed to do so in this case, we cannot say that substantial evidence supports the ALJ's dismissal of plaintiff's subjective complaints on the basis of plaintiff's failure to take her medication as prescribed. Accordingly, on remand, the ALJ should question plaintiff's treating physicians regarding the cause of plaintiff's failure to take her medication and the effect, if any, it has on her condition.

The ALJ's RFC assessment is also reason for concern. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual

AO72A
(Rev. 8/82)

functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).

Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical

evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,*

353 F.3d 642, 646 (8th Cir. 2003).

　　The evaluation of a mental impairment is often more complicated than the evaluation of

a claimed physical impairment. *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996).

Evidence of symptom-free periods, which may negate the finding of a physical disability, do not

compel a finding that disability based on a mental disorder has ceased. *Id.* Mental illness can

be extremely difficult to predict, and remissions are often of "uncertain duration and marked by

the impending possibility of relapse." *Id.* Individuals suffering from mental disorders often have

their lives structured to minimize stress and help control their symptoms, indicating that they

may actually be more impaired than their symptoms indicate. *Hutsell v. Massanari,* 259 F.3d

707, 711 (8th Cir.2001); 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999). This limited

tolerance for stress is particularly relevant because a claimant's residual functional capacity is

based on their ability to perform the requisite physical acts day in and day out, in the sometimes

competitive and stressful conditions in which real people work in the real world." *McCoy v.*

*Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (abrogated on other grounds).

　　Relying on mental RFC assessments from non-examining, consultative doctors, the ALJ

concluded that plaintiff was only moderately limited in her ability to understand, remember, and

carry out complex instructions; make judgments on complex work-related decisions; interact

appropriately with co-workers, supervisors, and the public; and respond appropriately to usual

work situations and routine work changes. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir.

AO72A
(Rev. 8/82)

1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). We note, however, that the record contains three mental RFC assessments prepared by plaintiff's treating psychiatrist, Dr. Durand. The ALJ dismissed Dr. Durand's opinion, stating that it was contradicted by his own treatment notes. After reviewing the entire record, we disagree.

The overwhelming weight of the evidence indicates that plaintiff's mental status was unstable, at best. Records indicate that plaintiff was raped by two men at around age 22 or 23 and suffered from PTSD. (Tr. 258). In 1994, plaintiff was diagnosed with bipolar disorder and personality disorder by Dr. Lewis Robinson. (Tr. 283-295). At the time of admission, she was assessed with a global assessment of functioning ("GAF") score of 35. Although she also complained of headaches, no acute pathology was ever found. (Tr. 285-285, 293, 295). An MRI of her brain and an EEG were both normal. Her one month hospital course was protracted and stormy, but her condition eventually stabilized and she was released to follow-up with outpatient management. (Tr. 286, 295).

Plaintiff was again hospitalized in 2001, following a relationship break-up and a diagnosis of cervical dysplasia. (Tr. 320-324). She reported feelings of hopelessness and unworthiness, a loss of interest, difficulty concentrating, and increasing reclusiveness. Plaintiff was diagnosed with depression, possible dependent personality disorder versus borderline personality disorder, and assessed with a GAF of 35. Dr. Andreea Arvinte prescribed Levothroid, Ferrous Gluconate, Elavil, Risperdal, Serzone, and Vioxx. (Tr. 321).

On March 1, 2004, plaintiff presented in the emergency room with complaints of lower back pain that had been going on for several days. (Tr. 189-195). Plaintiff stated that she had

AO72A
(Rev. 8/82)

passed a large blood clot and felt near syncopal with diaphoresis and dizziness. This episode was fairly brief and had improved. Plaintiff also reported some chest pain over her left side which was noted to be tender to palpation with pain radiating down her left arm. She indicated that she had experienced this type of pain in the past with panic attacks. Dr. Philip Sadler concluded that plaintiff's lower back pain, near-syncope, irregular vaginal bleeding, and chest pain/panic attack were likely secondary to her passing a blood clot causing a vasovagal syndrome. He did not feel that she warranted further work-up, but did refer her to a gynecologist. As she had recently begun taking birth control pills, Dr. Sadler prescribed Mefenamic Acid and Ultram. (Tr. 189-195).

On November 18, 2004, plaintiff complained of heart palpitations and depression. (Tr. 144). She had been on Effexor without improvement and was experiencing some side effects. Dr. Wilbur switched her to Zoloft and prescribed Atenolol to help with the heart palpitations. (Tr. 144).

On March 17, 2005, plaintiff was severely depressed, experiencing panic attacks, crying, and totally out of control. (Tr. 142). Dr. Paul Wilbur at the Mountain Home Christian Clinic ("MHCC") talked with her and prescribed Xanax for her panic attacks. He also started her on Lexapro and advised her to come to their daytime clinic. (Tr. 142)

By March 28, 2005, plaintiff was markedly improved. (Tr. 141). She was smiling and said that she had attended church, resolved the conflicts in her life, and was ready to move forward. Dr. Wilbur noted a very good response to the Lexapro and Xanax. He stated that she was so much better that he was entertaining the possibility that she might be suffering from manic depressive disorder. Her medications were continued for another month. (Tr. 141).

8

On April 21, 2005, plaintiff was doing very well on Lexapro. (Tr. 139). As such, Dr. Wilbur decided to begin tapering her off of the Xanax. (Tr. 139).

On September 1, 2005, plaintiff was worried about her weight and believed it was exacerbating her depression. (Tr. 137). She cried several times during the interview. Dr. Kaleb Gaston, also of MHCC, noted that she was currently on Lexapro and Xanax. He spent time with her discussing diet and exercise changes. Dr. Gaston diagnosed plaintiff with obesity, hypothyroidism, hot flashes with weight gain, and a family history of heart disease. He agreed to prescribe Fastin for one month and provided her with exercise guidelines to help her get started with her weight loss. (Tr. 137).

By September 19, 2005, plaintiff had again decompensated. (Tr. 136). She was crying, extremely anxious, and brought in a note of multiple somatic complaints. Dr. Wilbur concluded that plaintiff was markedly depressed, stressed, anxious, and without support. He doubted that any of her physical complaints were significant and opted to dismiss them and focus on her mental status. Based on her responses to questions, Dr. Wilbur was of the opinion that plaintiff was psychotic, but saw no indication that she was bipolar. He opted to increase her Lexapro dosage, continued the Synthroid, and prescribed Trazodone and Xanax. (Tr. 136).

On September 26, 2005, plaintiff was generally improved. (Tr. 135). She brought in a list of complaints which centered around problems with her eyes, concerns about her cholesterol level, and concerns about her weight. Plaintiff was upset that Dr. Wilbur would not prescribe diet pills, but he explained that preferred diets to pills. Due to her concerns with her eyes and an elevate cholesterol level, he prescribed Lipitor and referred her to Dr. Marx for an eye exam.

AO72A
(Rev. 8/82)

Dr. Wilbur also continued plaintiff's Xanax prescription, noting a fairly good response to this medication, but stating that she would need to continue this for "a while." (Tr. 135).

On October 3, 2005, plaintiff brought in another note listing multiple psychosomatic complaints. (Tr. 134). Generally, plaintiff reported a little improvement, but she was still quite depressed and experiencing crying spells. Dr. Wilbur noted that she was on the maximum dosage of Lexapro. Rather than add another medication to the Lexapro, he opted to switch her to Celexa. (Tr. 134).

On October 10, 2005, Dr. Wilbur noted that plaintiff was in a relationship with a boyfriend and a lesbian girlfriend. (Tr. 133). They were all reportedly living in the same house. She reported significant altercations among the three of them during the previous week. Plaintiff was crying, distraught, and had very poor self-esteem. Dr. Wilbur stated that he tried to give her some logical direction, but she did not take direction well. He spent a great deal of time talking to her about her situation and she also spoke to her patient advocate about it. Ultimately, Dr. Wilbur increased her Desyrel and Celexa dosages. (Tr. 132).

On October 17, 2005, plaintiff had a follow-up appointment with Dr. Wilbur concerning her anxiety/depression and situational problems. (Tr. 132). Plaintiff returned unimproved and crying. She stated that her girlfriend had attempted suicide on at least two occasions during the previous week. Dr. Wilbur explained to plaintiff that she needed to make some changes if she was going to get well. He indicated that she could no longer continue to live in the house with both her girlfriend and boyfriend. Dr. Wilbur called her girlfriend in and explained to both of them that the girlfriend had to leave. There was a good deal of tears all around, and some acting out behavior from the girlfriend. He noted that they were going to have to decide whether they

10

wanted to get well or continue causing pain. No medications changes were made at this time. Plaintiff was scheduled for a return appointment in one week. (Tr. 132).

On October 18, 2005, plaintiff saw Dr. Stephen Dollins for an initial psychiatric evaluation. (Tr. 155-156). Plaintiff reported problems with both depressive and manic symptoms. She stated that she experienced frequent depressive episodes, including crying spells, anhedonia, lack of motivation, and poor sleep. Plaintiff also complained of worries and anxiety associated with family illnesses and financial problems. Dr. Dollins noted that she was alert and cooperative, her speech was of normal rate and tone, her affect was sad and easily tearful, and her thinking was coherent and logical. No psychotic symptoms or suicidal thoughts were noted at this time. Dr. Dollins diagnosed plaintiff with major depressive disorder and panic disorder without agoraphobia. He prescribed a trial of Wellbutrin XL and Klonopin. Dr. Dollins also prescribed Trazodone. (Tr. 155-156).

On October 28, 2005, Dr. Dollins' notes indicate that he switched plaintiff from Wellbutrin to Paxil CR. (Tr. 155). On November 4, 2005, he had her discontinue the Klonopin and prescribed Gabitril. (Tr. 155). By November 28, 2005, Dr. Dollins had changed plaintiff from Paxil CR to Prozac. (Tr. 155).

On December 2, 2005, plaintiff was treated for a possible headache, panic attack, shakiness, difficulty sleeping, and chest pain. (Tr. 174-179, 226-227). She stated that she had not slept in three days. Dr. Philip Sadler indicated that he was familiar with the plaintiff due to her prior emergency room treatment. His notes reveal that she came into the emergency room very frantic with pressured speech, stating that she was concerned that she might be having a nervous breakdown. She repeatedly asked whether she was having a nervous breakdown and if

11

the doctor could run some tests that would tell her whether or not she was experiencing a nervous breakdown. Plaintiff was very difficult to obtain a history from, but stated that she had been experiencing these symptoms for quite some time. She also informed Dr. Sadler that Dr. Dollins had recently changed some of her medications. Plaintiff indicated that she was obtaining some of those medications through the prescription assistance program ("PAP") at the Mountain Home Christian Clinic. Dr. Sadler noted that she was tearful one minute and laughing the next, and she was very erratic with her behavior. Her physical examination was within normal limits. A urine drug screen was positive for amphetamines and marijuana, although plaintiff adamantly denied using amphetamines. She stated that she was taking some herbal medications that affected her drug screen. Plaintiff was diagnosed with anxiety and a headache. She indicated that she had not been compliant with her medications and was also drinking. After consulting with Ozark Counseling Services ("OCS"), Dr. Sadler offered to transfer plaintiff to a psychiatric facility but she refused. (Tr. 226-227). Finding that she was not a danger to herself or others, plaintiff was discharged home. She was given intravenous Benadryl, Reglan, and Toradol for her headache. (Tr. 174-179).

On December 8, 2005, plaintiff underwent an initial psychiatric evaluation with Dr. Dante Durand with OCS. (Tr. 228-232). She reported a long standing history of emotional instability, problems with multiple interpersonal relationships, impulsivity, and inappropriate intense anger. Plaintiff admitted to suicidal ideation accompanied with depressive symptoms and occasional hypomanic symptoms. She informed him that she had been hospitalized on two occasions due to suicidal ideations. Plaintiff also notified him that she was currently living with both her lesbian girlfriend and her boyfriend. She admitted a history of cannabis use and

12

physical abuse. Dr. Durand concluded that plaintiff's judgment/insight was only mildly impaired. Her affect was labile and her mood depressed. He noted that her concentration and memory were both impaired. Dr. Durand diagnosed plaintiff with bipolar II disorder, rule out PTSD, and borderline personality disorder. He assessed her with a GAF of 51 and prescribed Depakote ER. Dr. Durand directed plaintiff to continue the Prozac, Gabitril, and Trazodone. (Tr. 228-232).

This same date, Dr. Durand and Karen Moore, a counselor at OCS, completed an adult diagnostic assessment. (Tr. 222-225). They noted that plaintiff was experiencing a decreased appetite at times and binge eating other times, mood swings, crying spells, panic attacks, sweaty palms, chest pain, right shoulder pain, hypomania, difficulty sleeping, problems concentrating, guilt associated with undergoing two abortions, hypersensitivity, and grief because he mother was purportedly dying in New York. Plaintiff was unable to make good decisions and was unable to learn from her mistakes. Although not homicidal, plaintiff was noted to have issues with rage and to have a history of "beating up" others. The assessment indicated that these symptoms had been present since the early 1990s and plaintiff had been hospitalized in stress units on at least two occasions. They diagnosed plaintiff with bipolar II disorder in a hypomanic episode and PTSD. She was assessed with a GAF of 51. (Tr. 222-225).

On December 10, 2005, plaintiff presented at OCS stating that she was having a panic attack. (Tr. 220-221). She described her symptoms as total body shaking, sweaty palms, sensitivity to cold and heat, teeth chattering, spotted headaches, and black spots in her eyes. Plaintiff requested medication for anxiety, stating that she could not sleep. Plaintiff was referred to Dr. Durand. (Tr. 220-221).

AO72A
(Rev. 8/82)

On December 12, 2005, plaintiff complained of a possible panic attack, headache, chest pain, and crying spells. (Tr. 170-173). She reported multiple stressors, including financial burdens. (Tr. 216). However, she was not actively homicidal or suicidal. A urine drug screen was negative. Plaintiff was given Ativan and Ambien. She was diagnosed with acute anxiety, suicidal ideations, and a non-therapeutic Depakote level. (Tr. 170-173). A crisis intervention assessment and plan were implemented. (Tr. 216-220). She was assessed with a GAF of 45. Plaintiff signed a no harm contract agreeing to call the crisis hotline if she started experiencing suicidal or homicidal thoughts. She wanted to follow-up with her primary therapist, so she was scheduled for follow-up appointments at OCS prior to discharge. (Tr. 216-220).

On December 13, 2005, plaintiff felt that she was driving herself crazy. (Tr. 215). She was very dramatic, but denied suicidal ideation. Plaintiff had decided her girlfriend needed to move out to decrease her anger and anxiety. Ms. Moore recommended that plaintiff go to the stress unit, but she refused hospitalization. No change was noted in her condition or her GAF. (Tr. 215).

This same date, plaintiff presented to the emergency room due to a panic attack and crying spells. (Tr. 159-160). She was noted to be anxious and in moderate distress. A physical examination was normal and plaintiff was oriented to person, place, and time. Her mood and affect were also normal. Plaintiff was diagnosed with nervousness, treated, and released home. (Tr. 159-160).

On December 19, 2005, plaintiff remained very emotional. (Tr. 212). She felt guilty and had set boundaries with her female roommate. The roommate was to move out when she

14

received" her check." Ms. Moore noted that plaintiff was less emotional and was wearing make-up. However, she still assessed plaintiff with a GAF of 51. (Tr. 212).

On December 25, 2005, plaintiff saw Dr. Durand. (Tr. 213-214). He noted that she was referred to him by OCS because she had visited the ER three times over the past week for crisis intervention and suicidal thoughts. Dr. Durand indicated that plaintiff continued to have a labile mood and emotions. He prescribed Klonopin for anxiety. (Tr. 213-214).

On January 6, 2006, plaintiff was tearful and emotionally labile, complaining of multiple somatic symptoms, including headaches, neck pain, and shoulder pain. (Tr. 209-210). Plaintiff had been out of Prozac and Clonazepam for two days. She was neither suicidal nor homicidal, stating that she wanted to live and wanted to feel better. Dr. Durand noted that he worked on setting boundaries with her. He then increased her Depakote and Prozac dosages and discontinued the Gabitril. (Tr. 209-210).

On January 3, 2006, plaintiff was teary and stated that she was not attaining deep sleep. (Tr. 211). She wanted to get a job, but felt she was not feeling well enough yet. Plaintiff also reported problems with others believing her. Referring to Valium, Klonopin, and Xanax, plaintiff stated that she needed "the pills because they work." She was not happy that Dr. Durand had switched her medications so quickly. Ms. Moore's notes seem to indicate that plaintiff had bothered the doctors about this. Plaintiff had also talked her landlord prior to the landlord renting to her old roommate. Ms. Moore tried to discuss with her what she had learned about "opening her mouth," but plaintiff did not seem to understand. (Tr. 211).

On January 11, 2006, plaintiff was tearful and full of questions. (Tr. 208). She blamed others for her unhappiness. Ms. Moore indicated that decreased stress would eventually help

15

with functioning. She noted no change in plaintiff's condition and assessed her with a GAF of 51. (Tr. 208).

On January 18, 2006, plaintiff was afraid of the side effects of Depakote. (Tr. 207). However, her sleep had improved. Plaintiff also reported that her medical bills continued to increase. Ms. Moore assessed plaintiff with a GAF of 51 and noted no change in her condition. (Tr. 207).

On January 26, 2006, plaintiff's patient advocate at OCS encouraged her to make an appointment with Bill Davenport at DHS to apply for disability. (Tr. 205). Plaintiff was reportedly doing well and agreed to make an appointment. (Tr. 205).

On February 2, 2006, Dr. Durand wrote a letter indicating that he had been treating plaintiff at OCS for bipolar II disorder and borderline personality disorder. (Tr. 199). He stated that she was certified as an adult with a serious mental illness. Dr. Durand reported that plaintiff was receiving treatment on a regular basis with him, her therapist, and a case manager. (Tr. 199).

This same date, a psychiatric progress note reveals that plaintiff was much better. (Tr. 202-203). She seemed to be more stable. Plaintiff had stopped the Trazodone because she was sleeping well without it. She was compliant with her medications and reported that her girlfriend had moved out three weeks prior. Dr. Durand told her to continue taking the Depakote ER and asked her to follow-up in one month. (Tr. 202-203).

On February 6, 2006, plaintiff indicated that the Trazadone was no longer needed for sleep inducement. (Tr. 201). Ms. Moore noted that plaintiff was taking proactive actions to help herself. No emergency room visits were reported and plaintiff stated that she had applied for

AO72A
(Rev. 8/82)

disability and been able to let go of her controlling desire. Ms. Moore indicated that plaintiff had shown some improvement, but assessed her with a GAF of 51. (Tr. 201).

On February 15, 2006, plaintiff indicated that she was very tired and had been sleeping a lot. (Tr. 200). She indicated that she had set boundaries with her girlfriend and was trying to stop all contact. Plaintiff's anxiety had decreased and she reported no more chest pains. However, she continued to experience sweaty palm. As such, Ms. Moore noted some improvement and assessed plaintiff with a GAF of 51. (Tr. 200).

On February 20, 2006, a nurse's note at OCS indicates that plaintiff complained of continued weight gain although she was not eating anything. (Tr. 347). She requested that blood be drawn to check her thyroid. Dr. Austin noted that her thyroid level in June showed hyperactive thyroid which indicated that too high a dosage of medication may have been prescribed. Plaintiff stated that she had discontinued the Depakote, but had seen no changes in her weight as a result. Ms. Patterson explained to plaintiff the effects of aging on metabolism and how sodas were loaded with sugar and calories. Plaintiff agreed to watch what she was ingesting to see if that could be her problem. (Tr. 347).

On March 2, 2006, Dr. Durand noted that plaintiff looked much better. (Tr. 315-316). Plaintiff had stopped taking the Trazodone because she could sleep without it. Therefore, Dr. Durand increased her Prozac dosage. (Tr. 316).

This same day, plaintiff told Ms. Moore that she had experienced no highs, rather was sleeping all of the time. (Tr. 317). Plaintiff stated that she had no ambition. She also reported problems with her boyfriend and girlfriend and continued financial issues. (Tr. 317).

17

On March 10, 2006, plaintiff reported stomach upset due to stress. (Tr. 314). She stated that she was not functioning well with continued excessive sleeping and weight gain. Ms. Moore advised her to explore part-time jobs, volunteering, and to self engage. (Tr. 313).

On March 13, 2006, plaintiff reported doing well on her medications, but complained of exhaustion and weight gain. (Tr. 313).

On March 30, 2006, plaintiff was worried about paying her bills. (Tr. 312). She reported tightness in her chest. Plaintiff stated that she was uncertain whether she could work or go to school. She indicated that she was willing to got to Florida to take care of her mother and believed she needed to '"fight" for her disability. (Tr. 312).

A management/ collateral progress note dated April 10, 2006, states that plaintiff was compliant with her medications with only a few lingering side effects and symptoms. (Tr. 311). She reported some continued mood swings, depression more than mania, and anxiety and panic attacks associated with being denied disability. (Tr. 311).

On April 18, 2006, plaintiff had been with her boyfriend for one year and stated that he had a new job making more money. (Tr. 309-310). She told Ms. Moore that she wanted to apply for SSDI because she did not want to try and get a job. Ms. Moore encouraged her to look for work. (Tr. 309). A management/collateral progress note indicates that plaintiff was doing well on her medication and was experiencing no symptoms at this time. (Tr. 310).

On May 25, 2006, plaintiff reported weight gain, increased sleep, and increased mood swings over the previous month. (Tr. 349). She was tearful and pushed her way into Ms. Patterson's office. When Ms. Peterson returned from conferring with Dr. Austin, plaintiff was

18

standing over her desk reviewing her chart. She then had new questions for Ms. Peterson. Dr.

Austin advised Ms. Peterson to increase plaintiff's Depakote dosage. (Tr. 349).

On June 15, 2006, plaintiff continued to voice complaints of weight gain, increased

depression, and exhaustion. (Tr. 348). Dr. Austin stated that he could not make any medication

adjustments until she got her thyroid hormones balanced. (Tr. 348).

On July 6, 2006, plaintiff had a medication check with Dr. Austin. (Tr. 305). Plaintiff

was not doing well on Depakote. She also opined that the Prozac was not helping. The

Clonazepam seemed to be working well, although she did report occasional panic attacks. Dr.

Austin diagnosed her with bipolar II disorder, depressed type; PTSD; and, borderline personality

disorder. He assessed her with a GAF of 51 and prescribed Lamictal, Lexapro, and Clonazepam.

On September 22, 2006, plaintiff underwent a mental status and evaluation of adaptive

functioning exam with Dr. Stephen Harris. (Tr. 257-261). Plaintiff stated that she was applying

for disability because she was "not right upstairs." She reported a history of bipolar disorder,

depression, anxiety, and panic attacks. Plaintiff complained of crying spells, difficulty sleeping,

loss of appetite, and binge eating. She indicated that she had no energy and felt tired all of the

time and had to force herself to take a shower. Plaintiff had recently moved and indicated that

she was being treated through MHCC prior to her move. However, she could not remember

which medications she was taking and indicated that she was not seeing any mental health

professionals at the present time. Plaintiff did report a history of three prior psychiatric

hospitalizations for suicidal ideations as well as outpatient treatment through OCS for about a

year. Although plaintiff had a wonderful childhood, she was in special education classes and got

19

through "by the skin of [her] teeth." She also reported being raped by two men when she was 22 or 23. (Tr. 257-261).

Dr. Harris noted that plaintiff was anxious and somewhat dysphoric, and her mood appeared to be depressed. (Tr. 257-261). While spontaneous, she went from vague to well organized in her speech and mental activity. She could be understood and could communicate effectively for the most part, although vague at times. Plaintiff appeared to show withdrawal, passivity, and a great deal of dependency. However, she could care for her personal needs, drive, find her way on familiar routes, shop, perform household chores, prepare microwave meals, and make simple change. Plaintiff reported getting lost easily due to forgetfulness on unfamiliar routes. She denied hallucinations and delusions, but admitted to feeling like she was being watched. Plaintiff reported a loss of interest in all activities and changes in her appetite. She denied any current suicidal ideations, but stated that she had experienced them in the past. She cried as she described trying to overdose on medication and thoughts of driving off a cliff, hanging herself, or shooting herself. Dr. Harris estimated plaintiff's IQ to be between 71 and 79. He diagnosed her with rule out PTSD, rule out depressive disorder not otherwise specified, borderline personality disorder, and borderline intellectual functioning and assessed her with a GAF of 52. Dr. Harris opined that plaintiff's prognosis was guarded. He observed no limitations with regard to her concentration, persistence, and pace. Her adaptive functioning and intellectual level appeared to be commensurate in a borderline region. Further, plaintiff appeared to be open and honest in providing information for the evaluation, even though she emphasized her difficulties. (Tr. 257-261).

20

On November 16, 2006, plaintiff requested a refill of Clonazepam. (Tr. 346). She had moved to Jasper and had been unable to get an appointment with her doctor in Harrison until later in the week. Dr. Austin authorized one refill of Clonazepam. (Tr. 346).

On December 15, 2006, plaintiff indicated that she had been off of her medication for a month. (Tr. 303-304). As a result, she was experiencing crying spells, weight gain, and problems with oversleeping. Dr. Durand noted her history of bipolar II disorder, PTSD, hypothyroid, borderline personality disorder, irritable bowel syndrome, and headaches. He cautioned her about medication compliance. (Tr. 303-304). Plaintiff was then given samples of Lexapro and Lamictal because she had no income. (Tr. 345).

On January 12, 2007, plaintiff complained of poor energy, weight gain, sleepiness, depressed mood, and a lack of motivation. (Tr. 299-300). Dr. Durand noted that plaintiff had stopped taking Depakote in May 2006. She was currently taking Lamictal to no avail. Dr. Durand restarted plaintiff of Depakote and recommended a weight management program. (Tr. 299-300).

On January 15, 2007, plaintiff was out of Lexapro and had become increasingly anxious. (Tr. 343). She felt that the medications were working relatively well until she ran out. Dr. Austin authorized a refill of Klonopin and the release of samples of Lexapro. (Tr. 343).

On February 16, 2007, plaintiff remained tired and continued to experience problems with weight gain. (Tr. 301-302). However, she had not been out of Synthroid for one month and had just been given a new prescription for it the previous night. Dr. Durand noted that plaintiff had moved to Yellville with her girlfriend. (Tr. 301-302). A medication administration note indicated that plaintiff was given samples of Depakote ER with verbal instructions. (Tr. 342).

AO72A
(Rev. 8/82)

On April 16, 2007, plaintiff requested a refill of Klonopin. (Tr. 341). She had reportedly taken her last one that morning. However, it was noted that she had just been given a new prescription with one refill of this medication on February 16. Plaintiff denied taking extra, but also stated that it was not helping. The consultant at OCS explained there would be no early refills of this medication. (Tr. 341) .

On April 17, 2007, plaintiff reported non-compliance with Depakote. (Tr. 297-298). She felt miserable and relayed active suicidal ideations. Dr. Durand prescribed Depakote and referred her for psychotherapy. Her medications were Lexapro, Depakote, and Clonazepam. (Tr. 297-298).

On May 16, 2007, plaintiff was doing much better. (Tr. 338-339). She reported no mood changes or tearfulness and denied anxiety and panic attacks. Plaintiff was compliant with her medication and stated that her sleep was ok. (Tr. 338-339).

On June 14, 2007, plaintiff requested samples of Lexapro and Depakote. (Tr. 336). When confronted with the fact that she had been given a three month prescription for both in April, plaintiff stated that she was taking two a day because she thought they were ten milligram pills. Plaintiff was given samples. (Tr. 336).

On August 15, 2007, plaintiff indicated that she was out of Lexapro. (Tr. 335). She had applied for the it through the PAP program, but her medication had not yet arrived. She also asked if Dr. Durand would give her a new prescription for Synthroid, as she had just taken her last one. Samples of Lexapro were provided, but Dr. Durand refused to provide her with Synthroid. (Tr. 335).

AO72A
(Rev. 8/82)

On September 17, 2007, plaintiff reported an increased appetite, weight gain, and increased sleep since stopping Synthroid. (Tr. 332-33). She also complained of frequent tearfulness. Dr. Durand prescribed Lexapro, Depakote ER, and Clonazepam. (Tr. 332-333).

This same date, Dr. Durand completed a mental RFC questionnaire. (Tr. 353-359). He stated that he had been treating plaintiff for twenty months on a monthly basis for bipolar II disorder, PTSD, and borderline personality disorder. He assessed her with a GAF of 45, her highest in the previous year being 50. Dr. Durand stated that plaintiff's treatment consisted of psychotherapy and medication management to which she had a fair response. He indicated that plaintiff had been prescribed Lexapro, Depakote ER, and Clonazepam. Further, Dr. Durand stated that plaintiff's emotional state remained unstable; she experienced problems relating to others, exhibited a depressed mood with anhedonia; and, was impulsive. He listed her prognosis as fair to poor. As such, he concluded that plaintiff would be unable to meet competitive standards in the areas of maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; carrying out detailed instructions; and, dealing with the stress of semiskilled and skilled work. He also found plaintiff to be seriously limited with regard to remembering work-like procedures; maintaining attention for two hour segments; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without

23

unduly distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; understanding and remembering detailed instructions; setting realistic goals or making plans independently of others; traveling in unfamiliar places; and, using public transportation. Dr. Durand then stated that plaintiff did not have a low IQ or reduced intellectual functioning, but that her depression would lower her pain tolerance. He also concluded that plaintiff would miss more than four days of work per month due to her impairments and/or treatment for her impairments. Dr. Durand concluded that plaintiff was unable to maintain a regular work schedule due to her depression symptoms which included poor concentration, poor motivation, increased sleep, and low energy. Her borderline personality disorder symptoms also resulted in unstable interpersonal relationships, impulsivity, and uncontrollable anger. (Tr. 353-359).

On October 23, 2007, Dr. Durand completed another mental RFC assessment. (Tr. 120-125, 361-366). The doctor indicated that he treated plaintiff every two months for bipolar II disorder, borderline personality disorder, hypothyroidism, and irritable bowel syndrome. He assessed her with a GAF of 50, having had a high of 51 for the previous year with a fair response to medication. Dr. Durand reported that plaintiff was taking Lexapro, Depakote, and Clonazepam with drowsiness as a reported side effect. He indicated that plaintiff exhibited a dysphoric mood, labile affect, intermittent suicidal ideation, poor concentration, and limited short-term memory. Her prognosis was noted to be fair to poor. As such, he concluded that plaintiff would be unable to meet competitive standards in the areas of remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention for two hour segments; maintaining regular attendance and being punctual

24

within customary and usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; understanding, remembering, and carrying out detailed instructions; and, dealing with the stress of semiskilled and skilled work. He also found plaintiff to be seriously limited with regard to sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; being aware of normal hazards and taking appropriate precautions; setting realistic goals or making plans independently of others; interacting appropriately with the general public; maintaining socially appropriate behavior; and, adhering to basic standards of neatness and cleanliness. Dr. Durand also stated that plaintiff's psychiatric condition made her pain condition more difficult to treat. Further, he was of the opinion that plaintiff would miss more than four days of work per month due to her impairments and treatment. (Tr. 120-125).

On July 8, 2008, Dr. Durand completed yet another mental RFC questionnaire. (Tr. 370-374). He indicated that he had been treating plaintiff once per month since January 2007. Dr. Durand stated that plaintiff had been diagnosed with bipolar II disorder, PTSD, borderline personality disorder, hypothyroidism, irritable bowel syndrome, and fibromyalgia. She had been prescribed Depakote, Lexapro, and Clonazepam to treat her mental impairments with only a partial response. Further, these medications made her drowsy. Dr. Durand explained that

plaintiff experienced anxiety, depressed mood, crying spells, suicidal thoughts, poor concentration, irregular sleep, and impulsivity. He opined that her condition was guarded. Dr. Durand went on to find that plaintiff had no useful ability to function in the areas of understanding and remembering very short and simple instructions; maintaining attention for two hour segments; maintaining regular attendance and be punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; understanding, remembering, and carrying out detailed instructions; and dealing with the stress of semiskilled and skilled work. Further he found plaintiff unable to meet competitive standards with regard to remembering work-like procedures, carrying out very short and simple instructions, asking simple questions or requesting assistance, being aware of normal hazards and taking appropriate precautions, understanding and remembering detailed instructions, interacting appropriately with the general public, maintaining socially appropriate behavior, traveling in unfamiliar places, and using public transportation. Her ability to adhere to basic standards of neatness and cleanliness were also seriously limited. Dr. Durand declared that plaintiff's severe depressed mood and anhedonia would prevent her from fulfilling any work-related activities. He noted concentration problems and forgetfulness

26

that would prevent her from carrying out detailed instructions. He also reported that she was unable to maintain appropriate social behavior due to severe anxiety and emotional distress. Dr. Durand stated that plaintiff's depression exacerbated her fibromyalgia and that her impairments or treatment would result in plaintiff missing more than four days of work per month. (Tr. 370-374).

The ALJ dismissed Dr. Durand's RFC assessments, stating that they were inconsistent with his own treatment records. We note, however, that Dr. Durand's treatment records clearly indicate that plaintiff's condition has not consistently remained stable. The records show that plaintiff has been prescribed a variety of anti-depressant/anti-anxiety medications over the years, none of which have provided her with significant and lasting relief from her symptoms. Improvement might be noted one month, plaintiff would decompensate the next. She consistently complained of exhaustion, sleepiness, weight gain, and anhedonia. Other times, plaintiff reported sleeplessness and required prescription medication to help her sleep. She also experienced a great deal of difficulty with interpersonal relationships and judgment/insight, as is evidence by her concurrent relationships and living arrangement with her boyfriend and girlfriend.

While we note that Dr. Durand's assessments differ from one another in significant ways, we also note that plaintiff's mental status varied from month to month. The record indicates that plaintiff saw Dr. Durand on a monthly basis. As these assessments were completed one month and eight months apart, respectively, and the record contains no treatment notes for October 2007 through July 2008, we can not say that they contradict one another. We believe the ALJ should have attempted to obtain these records, prior to summarily dismissing Dr. Durand's opinions as

27

being contradictory. Therefore, on remand, he is directed to seek further treatment records for

Dr. Durand and clarification as to the specific reasons for the variances in his opinions.

Plaintiff also complained of pain in her head, neck, and shoulders. While we agree with

the ALJ that there is no objective medical evidence to show that plaintiff was suffering from a

severe physical impairment resulting in her pain, we believe the ALJ should have considered the

link between depression and physical pain. Pain is depressing and depression causes and

magnifies pain, making it more difficult for sufferers to cope with everyday living. *See*

*Depression and Pain,* Harvard Mental Health Letter, September 2004, *at*

www.healthlharvard.edu/mental; *Depression and Chronic Pain*, *at* www.

webmed.com/depression.

> Normally, the brain diverts signals of physical discomfort so that we can
> concentrate on the external world. When this shutoff mechanism is impaired,
> physical sensations, including pain, are more likely to become the center of
> attention. Brain pathways that handle the reception of pain signals, including the
> seat of emotions in the limbic region, use some of the same neurotransmitters
> involved in the regulation of mood, especially serotonin and norepinephrine.
> When regulation fails, pain is intensified along with sadness, hopelessness, and
> anxiety.

*Depression and Pain,* Harvard Mental Health Letter, September 2004, *at*

www.healthlharvard.edu/mental. Plaintiff complained of chest pain, neck pain, and shoulder on

numerous occasions. Although there may not be any objective evidence to show that plaintiff

suffered from a physical impairment causing her pain, the ALJ should have considered her

physical pain, as it is a probable component of her depression.

Therefore, on remand, the ALJ is directed to reconsider plaintiff's subjective complaints,

investigate the cause of plaintiff's medication noncompliance, reconsider Dr. Durand's RFC

28

assessments and seek clarification from him concerning the variances in his opinions, and consider plaintiff's physical pain as a probable component of her depression.

**Conclusion**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this <u>19th</u> day of February 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)